UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| TRUTH, et al., | No. C03-785P |
| Plaintiffs, | |
| v. | ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |
| KENT SCHOOL DISTRICT, et al., | |
| Defendants. | |

Defendant Kent School District moves for summary judgment on municipal liability claiming that no official of policy making authority stated that Defendant Truth could not legally exist at Kentridge. (Dkt. No 16.). There are genuine issues of material fact as to whether officials of policymaking authority had actual knowledge of and were deliberately indifferent to the alleged constitutional violations as Plaintiffs sought definitive review of their application for their student group. Additionally, Plaintiffs have demonstrated that additional discovery is necessary to develop their claim at this early stage of the litigation. Accordingly, Defendant's motion for summary judgment is DENIED.

BACKGROUND

This case involves a Christian student group's efforts to gain Kent School District's ("the District") recognition as a legitimate non-curriculum student group, approved and funded by Kentridge High School's Associated Student Body ("ASB"). After repeated attempts to apply for approval, Kentridge administrators deferred to the ASB leadership to consider Truth Bible Club's ("Truth") application. When the ASB denied the application,

ORDER - 1

Plaintiff club members brought suit under 42 U.S.C. § 1983 for injunctive relief, arguing that Defendants Kentridge Principal, Mike Albrecht, and District Superintendent, Barbara Grohe, in their official capacity, were deliberately indifferent to violations of the Plaintiffs' rights under the First Amendment and the Equal Access Act, 20 U.S.C. § 4071 et seq.

Kentridge High School ("Kentridge") permits student clubs to meet on campus during non-instructional time, advertise their activities, and receive ASB funds and recognition in the Kentridge yearbook. Plaintiffs Sarice Undis and Julianne Stewart are Christian students who with other students formed Truth in September or October 2001 as a student organization "to grow in their relationship with Jesus Christ, study the Bible, associate in fellowship with other Christians. . . ." Stewart Decl ¶ 3. Kentridge currently has several non-curriculum student groups, including the Chess Club, the Snowriders Club, the Gay-Straight Alliance, among others.

Some time in October 2001, Plaintiffs submitted an application to the ASB for non-curriculum club status. At a subsequent ASB meeting, numerous students objected to the Christian club's formation, which spurred a controversy within the ASB. Plaintiffs claim that they addressed their concerns to Eric Anderson, Kentridge Vice Principle and the ASB Advisor and Activities Coordinator, who allegedly represented that he would clarify with the school's attorney the legality of allowing a student religious group to form on campus. Plaintiffs claim further that between October 2001 and June 2002, they attempted at least ten times to have Kentridge render a decision on the matter, but to no avail. According to Plaintiffs, Vice Principal Anderson continually represented that Kentridge had not reached a decision. In the spring of 2002, Mr. Anderson asked the existing non-curriculum clubs to revise their charters in an alleged effort to have the groups resemble more closely "curriculum" groups.

Still without ASB status, from September to December 2002, Plaintiffs again repeatedly inquired with Mr. Anderson about club approval, without effective response. On

ORDER - 2

January 7, 2003, Plaintiffs' counsel contacted Principal Albrecht by fax with a letter that outlined Plaintiffs' grievances, stated the purported legal authority requiring the District's recognition of Truth, and requested that Kentridge admit Truth as a non-curriculum group.

In February 2003, Plaintiffs again requested clarification from Mr. Anderson. He responded that Truth would have to submit a new charter for consideration. According to Plaintiffs, Mr. Anderson delayed in sending them a new charter form until Plaintiffs' counsel contacted the District's in-house counsel, Michael Harrington. After Plaintiffs received the new form, they submitted it to Mr. Anderson. With no response from Mr. Anderson, Plaintiffs' counsel purportedly called Mr. Harrington numerous times, and ultimately sent him a third letter on February 23, 2003 stating Truth's position. In this letter to Mr. Harrington, Plaintiffs' counsel argued the admission of Truth as a non-curriculum club should not be contingent on the ASB's approval because the Christians had a federal right to form a club. Plaintiffs allege that no Kentridge or District official returned counsel's calls.

On March 28, 2003, Mr. Anderson contacted Plaintiff Stewart and convened an ASB meeting. At this meeting, Ms. Stewart was asked questions about the religious purpose of her group, but no vote was taken. On April 1, the ASB met again to vote. According to Plaintiffs, prior to the vote, Mr. Anderson stated that if the ASB approved Truth, the school administration would ultimately determine whether Truth could legally exist; however, in the event of an ASB denial, Truth would not be allowed to exist. Stewart Decl. ¶ 9. Mr. Anderson purportedly justified this position because other (non-Christian) students might be made to feel that "they were believing a lie." Id. The ASB voted to reject Truth's charter and application.

On April 4, Plaintiffs filed this suit alleging constitutional and statutory violations. Sometime thereafter, Mr. Anderson informed Plaintiffs that they could amend their charter and re-submit the application. Despite some changes, Plaintiffs left a provision requiring voting members to sign an oath of religious belief. On April 25, the ASB again voted to

ORDER - 3

1  reject Truth's charter. On May 12, 2003, Mr. Anderson notified Plaintiffs by letter
2  informing them that they could make an appointment to discuss the ASB's decision with
3  Superintendent Grohe or contact the Ombudservices at the District's Legal Department.
4  Although not identified explicitly in Mr. Anderson's letter, this is the grievance procedure to
5  be followed in the event of a "Religious-related" dispute. See Policy 2340P. According to
6  the record, no reference is made to this grievance procedure prior to May 12, 2003.

7  Defendants move for summary judgment, claiming that no official of policy making
8  authority stated that Truth could not legally exist at Kentridge. Because state law authorizes
9  only the District's board of directors to review ASB activities and operations, see WAC §
10 392-138-010 (2003), Defendants argue that the case should be dismissed for lack of ripeness
11 where Plaintiffs based grievances only on statements by Vice Principal Anderson and
12 inaction by Principal Albrecht, both of whom were subordinate officials without
13 policymaking authority. Absent implementation of an authorized policy that is
14 unconstitutional, Defendants argue, municipal liability is precluded in the § 1983 claim.

## ANALYSIS

16 This matter comes before the Court on summary judgment. Summary judgment is not
17 warranted if a material issue of fact exists for trial. Warren v. City of Carlsbad, 58 F.3d 439,
18 441 (9th Cir. 1995), cert. denied, 516 U.S. 1171 (1996). The underlying facts are viewed in
19 the light most favorable to the party opposing the motion, here the Plaintiff. Matsushita
20 Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). "Summary judgment will
21 not lie if . . . the evidence is such that a reasonable jury could return a verdict for the
22 nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

23 Defendants also oppose summary judgment on the grounds of Federal Rule of Civil
24 Procedure 56(f). If the opposing party's declarations show that he or she "cannot for reasons
25 stated present by affidavit facts essential to justify the party's opposition," the Court may
26 deny the motion for summary judgment to allow additional discovery. Fed. R. Civ. P. 56(f).

ORDER - 4

1  The opposing party must explain its inability to provide opposing declarations at present,
2  stating what facts are sought, and showing how these facts are reasonably expected to create
3  a triable issue.  See Stearns Airport Equip. Co. v. FMC Corp., 170 F.3d 518, 535 (5th Cir.
4  1999).

A.     Theories of Municipal Liability

Municipalities and other bodies of local government are "persons" within the meaning of 42 U.S.C. § 1983 that may be sued directly if they are alleged to have caused a constitutional tort through "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Monell v. New York City Dept. of Social Services, 436 U.S. 658, 690 (1978).  While rejecting the use of the doctrine of respondeat superior, the Monell Court nevertheless concluded that local government could be held liable when an injury was inflicted by a government's "lawmakers or by those whose edicts or acts may fairly be said to represent official policy." Id. at 694.

"'Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority." City of St. Louis v. Praprotnik, 485 U.S. 112, 118 (1988) (quoting Pembaur v. Cincinnati, 475 U. S. 469, 483 (1986)).  "[W]hether an official had final policymaking authority is a question of state law."  Id.  The authority to make municipal policy is necessarily the authority to make final policy.  Pembaur, 475 U. S. at 481-484.  When an official's discretionary decisions are constrained by official policy, the official policy, rather than the subordinate's deviations from it, is the act of the municipality.  Praprotnik, 485 U.S at 127.  "When a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies."  Id.  If the authorized policymakers approve a subordinate's decision, their ratification would be chargeable to the municipality because their decision is final.  Id.

ORDER - 5

1  Municipal liability may obtain in a second way when a plaintiff demonstrates that an official with policymaking authority was deliberately indifferent to constitutional violations. See Bd. of County Commissioners of Bryan Co. v. Brown, 520 U.S. 397, 411 (1997). To prove deliberate indifference, a plaintiff would have to show that an official with policymaking authority had actual knowledge of the alleged constitutional violations. Cf. Gebser v. Lago Vista Independent Sch. Dist., 524 U.S. 274, 290-291 (1998) (requiring official's actual knowledge of sexual harassment for school's liability in Title IX claim in parallel to deliberate indifference standard for § 1983 claims). A plaintiff may show that actionable conduct was the result of "'a deliberate choice . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.'" Hyland v. Wonder, 117 F.3d 405, 414 (9th Cir. 1997) (quoting Pembaur, 475 U.S. at 483-84).

Under a third theory, local governments may also be liable in § 1983 actions when local government egregiously attempts to insulate itself from liability for unconstitutional policies. Praprotnik, 485 U.S. at 127. A plaintiff may be able to prove that the existence of a widespread practice, unauthorized by written law or express municipal policy, is "so permanent and well settled as to constitute 'a custom or usage' with the force of law." Id. (quoting Adickes v. S. H. Kress & Co., 398 U.S. 144, 167-168 (1970)). This establishes a separate theory for municipal liability, which "ensures that most deliberate municipal evasions of the Constitution will be sharply limited." Id.

Plaintiffs appear to proceed under each theory, alleging that: (1) the District delegated authority to review ASB decisions to Principal Albrecht, who ratified the ASB's rejection of Truth's bid for noncurriculum club status; (2) the District and Kentridge failed to develop a definitive policy as to whether Truth could legally exist in deliberate indifference to a prima facie case of First Amendment violation; and (3) Kentridge insulated itself from liability by

ORDER - 6

hiding behind the ASB's decision without providing for any discernible mechanism for review.

To survive summary judgment, Plaintiffs must only demonstrate that a genuine issue of material fact exists with respect to any of these theories of liability, or demonstrate that a Rule 56(f) continuance is appropriate.

### 1. Official Policy and Ramification

When an official's discretionary decisions are constrained by official policy, the official policy, rather than the subordinate's deviations, is the act of the municipality. Praprotnik, 485 U.S at 127. It is inescapable that Mr. Anderson and Principal Albrecht are merely subordinate officials with no policymaking authority. The line of authority to make District policy is demarcated pursuant to state law. Id. at 118. Washington law is clear that the ASB "is operated subject to the control. . . of the board of a school district." WAC § 392-138-101(1). Plaintiffs' argument that Principal Albrecht was the district's designee on this matter is not supported. See District Policy 2153 (dealing only with delegation of authority to principals on matters concerning "noncurriculum-related, non ASP student groups").

Even if one assumes that Principal Albrecht or Mr. Anderson informed their superiors of their actions, the time frame between the ASB's decision on April 1, 2003 and the filing of suit on April 4 is quite short for the Superintendent or board of directors to have ratified the rejection of Truth. Nonetheless, Plaintiffs have not had the opportunity to depose Principal Albrecht or Mr. Anderson regarding their contacts with district policymakers. This discovery is essential for Plaintiffs to develop their argument regarding ratification.

### 2. Defendants' deliberate indifference

In contrast to the very short time line between April 1 and April 4 noted above, Plaintiffs persuasively contend that Kentridge and the District had notice of potential constitutional abridgement much earlier. Plaintiffs claim that between October 2001 and

ORDER - 7

June 2002, they unsuccessfully attempted at least ten times to have Kentridge render a decision on the matter.  Each time, Mr. Anderson purportedly responded that he was clarifying the legality of an ASB  religious group.  When school was again in session in September 2002,  Plaintiffs repeated their inquiries with Mr. Anderson about Kentridge's position.  Presumably, Mr. Anderson, as ASB Advisor, was aware that only the board of directors, under WAC § 392-138-010, could make policy with respect to the issue of religious groups on campus.  By his own purported representations, he was conferring with Principal Albrecht and in-house counsel Michael Harrington.  The hearsay issue aside, as of December 2002, the District had at most constructive knowledge of alleged constitutional violations, which is insufficient to create the question of municipal liability.  See Gebser, 524 U.S. at 279.  Nevertheless, Mr. Anderson's statements that he would seek clarification on the legality of Truth's ASB membership creates a genuine issue material fact as to whether he actually informed his superior about the matter, and consequently, as to whether an official of policymaking authority (such as Ms. Grohe) had actual knowledge about the controversy.  Additionally, at this early stage in the litigation, it is appropriate for Plaintiffs to need discovery regarding Mr. Anderson's communications with supervisors in order to develop proof of deliberate indifference.

On January 7, 2003, Plaintiffs effected actual notice to Principal Albrecht when Plaintiffs' counsel faxed him a Demand Letter which outlined Plaintiffs' grievances, the purported legal authority for recognition of a religious group, and a requested that Kentridge admit Truth as a non-curriculum group.  In light of WAC § 392-138-010, there is a fair inference that Principal Albrecht would have consulted with his superiors on the board of directors about any policy Kentridge might take with respect to the Truth application for ASB membership.  In any event, discovery regarding Principal Albrecht's communications with any officials of policymaking authority is clearly critical for Plaintiffs to demonstrate any deliberate indifference on the part of the district.

ORDER - 8

It is unclear whether Plaintiffs may have provided notice to policymakers in accordance with Policy 2340, which addressed "Religious-related Activities or Practices." District Policy 2340 establishes procedures for lodging complaints dealing with religious issues:

> Students . . . who are aggrieved by practices or activities conducted in the school or district may seek resolution of their concern first with the building principle, then with the district superintendent or designee, or use of ombudservices, which is available through the Legal Services Department.

Plaintiffs arguably notified the District of its complaint by contacting Principal Albrecht and Mr. Harrington. It is unclear whether Mr. Harrington serves as in-house counsel to Kentridge High School only, or whether he also is a liaison of some sort to the District's Legal Services Department. This is an important issue of fact which is appropriately addressed in discovery.

There is an unresolved issue of fact as to whether Superintendent Grohe and/or the District's board of directors had actual knowledge of Plaintiffs' on-going grievance and alleged denial of constitutional rights.

3.   <u>Improper insulation from liability</u>

As discussed above, for nearly a year and a half, Plaintiffs persistently notified Kentridge officials that they allegedly suffered deprivation of their First Amendment rights. This airing of grievances was registered both as a series of informal complaints to Mr. Anderson and as sophisticated written notice by counsel, each well before the ASB vote on April 1, 2003. Despite this considerable forewarning, Mr. Anderson, and arguably Principal Albrecht, channeled a decision with constitutional implications into the ASB. Plaintiffs appropriate seek further discovery on any allegedly unconstitutional customs regarding the ASB and its relationship with the Principal, Vice Principal, and policymaking authorities in the District.

By the Defendants' own admission regarding District policy, the results of the ASB' deliberations and vote were not dispositive of the pressing issue at hand. <u>See</u> Def Rep. at 5-

ORDER - 9

6. That Kentridge officials convened an ASB meeting to vote on an issue which the ASB could not properly address, supports the inference that these officials were insulating Kentridge from liability. Mr. Anderson's letter to Plaintiffs on May 12, 2003 (six weeks after suit was filed), instructing them on the proper procedure to contest the ASB decision pursuant to the Policy 2340P, is tardy to say the least and does not necessarily rescue the District from liability. The District's inaction in response to repeated complaints reinforces this inference. Absent a factual record which is appropriately developed through discovery, the Court cannot determine as a matter of law whether such tactics do not resembled "municipal evasions of the Constitution [that are to] be sharply limited." Praprotnik, 485 U.S. at 127.

## CONCLUSION

Genuine issues of material fact exist regarding whether District policymakers had actual knowledge of and were deliberately indifferent to Plaintiffs' alleged constitutional violations. Additionally, Plaintiffs have demonstrated that additional discovery is necessary to develop their claim at this early stage of the litigation. Accordingly, Defendant's motion for summary judgment is DENIED. Because the Plaintiffs have prevailed on this summary judgment motion, their motion to file a surreply (Dkt. no 43) is STRICKEN as moot.

The Clerk is directed to send copies of this order to all counsel of record.

Dated this 16th day of September, 2003.

/s/ Marsha J. Pechman
Marsha J. Pechman
United States District Judge

ORDER - 10