UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

TRUTH, et al.,

          Plaintiffs,

    v.

KENT SCHOOL DISTRICT, et al.,

          Defendants.

No. C03-785P

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT AND DENYING
PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT

      This matter comes before the Court on the parties' cross-motions for summary judgment. (Dkt. Nos. 71, 74). Having reviewed the parties' pleadings and supporting materials and having heard oral argument by both parties, the Court GRANTS Defendants' Motion for Summary Judgment and DENIES Plaintiffs' Motion for Summary Judgment. Defendants are not liable under § 1983 for any alleged constitutional violations. Even if they were, Defendants' actions have not violated Plaintiffs' constitutional rights. Likewise, Defendants' actions have not violated the Equal Access Act.

BACKGROUND

      This Court outlined in detail the facts in this case in its December 31, 2003 Order Denying Plaintiffs' Motion for a Preliminary Injunction, (Dkt. No. 58). In the statement of facts section of their

current Motion for Summary Judgment, Plaintiffs quote the Preliminary Injunction Order's recitation of the facts. Because those facts remain unchanged, this Order's factual recitation is largely the same as in the Preliminary Injunction Order. Both parties point to additional relevant and undisputed facts, which are incorporated below.

This case involves a Christian student group's efforts to form a Bible club named "Truth" at Kentridge High School ("the School") and gain recognition as a legitimate non-curriculum student group, approved and funded by the High School's Associated Student Body ("ASB"). The ASB consists of selected students who act as representatives of the student body. (Stewart Decl.,[1] Ex. B). ASB clubs can meet during non-instructional time on campus and can raise money and receive ASB funds. Additionally, an ASB club is entitled to advertise its activities, be recognized in the school yearbook, and announce club activities over the public address system.

At the time this case was filed, Plaintiff Sarice Undis was a senior at Kentridge and Plaintiff Julianne Stewart was a junior there.[2] Both were involved in forming the Truth Bible Club ("the Bible Club" or "the Club"). In September, 2001, Ms. Stewart submitted an application, known as a "Charter," to the ASB for approval as an ASB club. (Tierney Decl.,[3] Ex. 8 ("the First Application")). The Charter application indicated that the Club's purpose was "to have Bible study to encourage and help become better people, with good morals." (Id.) The Club proposed to do a "quote of the week

_____

[1]   In their Motion for Summary Judgment, Plaintiffs incorporate and cite to the declarations of Sarice Undis, Julianne Stewart, Robert Tyler that were filed in support of Plaintiffs' Response to Defendants' (First) Motion for Summary Judgment, which was filed July 17, 2003. Therefore, this Order cites to these same declarations.

[2]   Both of these Plaintiffs have since graduated. Ms. Stewart indicates that Lindsay Thomas, a current student, has replaced Ms. Stewart as the unofficial leader of the Club. (Second Stewart Decl., ¶ 3).

[3]   In the interest of clarity, "Tierney Decl." refers to the declaration of Michael Tierney, filed with Defendants' currently pending Motion for Summary Judgment, as opposed to the Tierney declaration, which was filed with Defendants' response to Plaintiffs' Motion for Summary Judgment.

for announcement" and "once a month decorate [the] school with a theme" in addition to prayer.  (Id.)  The Club indicated that it would be open to everyone.  (Id.)  At an ASB meeting held in 2001 sometime after the application was submitted, numerous students objected to the Club.  The ASB indicated that it intended to discuss the matter with Assistant Principal Eric Anderson.  Assistant Principal Anderson then told Ms. Undis that he and Principal Michael Albrecht were going to speak with the school's attorney regarding the legality of the Bible Club.  (Undis Decl., ¶ 5).

According to Ms. Undis, between October, 2001 and June, 2002, she requested on at least ten occasions that Assistant Principal Anderson make a decision on the Club's application.  (Id.)  In the Spring of 2002, all school clubs were ordered to resubmit their Charters.  (Id., ¶ 6).  Ms. Undis states that "[i]t was common knowledge among the student club officials, due to a school newspaper article and various conversations, that the School District was discontent [sic] with the application by the Bible Club and the School District sought to have the present club charters appear more like 'curriculum related' clubs."  (Id.)  The record does not indicate that any change in the nature of the approved ASB clubs came of this effort.  Ms Undis continued to request a decision on the Bible Club from September until December, 2002. (Id., ¶ 7).

On January 7, 2003, Robert Tyler, an attorney for the Plaintiffs, faxed a letter to Principal Albrecht, stating that the School was legally compelled to grant official recognition to the Club and demanding the School do so immediately.  (Tyler Decl., Ex. J).  On January 30, Mr. Tyler faxed a second letter to the School, this time directed to Michael Harrington, in-house counsel for the Kent School District ("the District"), asking for the forms necessary to file an application to gain ASB club status.  The letter stated that the Plaintiffs would file a complaint in federal court if the Club were not approved by February 4.  (Id., Ex. K).

Ms. Stewart submitted a new Charter application on February 2, 2003.  (Tierney Decl., Ex. 9 ("the Second Application")).  This application differed from the First Application in two relevant respects.  First, the Second Application did not contain the same quote of the week or monthly

decoration proposals.  It indicated that its intended function was to "provide a biblically-based club for those students interested in growing in their relationship with Jesus Christ."  Second, it stated that "only those professing a belief in the Bible and in Jesus Christ may vote."  (Id.)  The Club's constitution, which was submitted with the Charter application, reiterated the "belief" requirement for voting members.  (Id., Ex. 10, Art. III).

On February 25, Mr. Tyler faxed a third letter to Mr. Harrington stating that neither he nor Plaintiffs had received word whether the Club was approved or not, and that if they did not hear by February 26, they would assume the application was denied.  (Tyler Decl., Ex. L).

On March 27, 2003, Assistant Principal Anderson held an ASB meeting in which the Club's Second Application was discussed.  (Tierney Decl., Ex. 20 (ASB meeting minutes)).  Defendants maintain that the students on the ASB, not the School administration, raised concerns about the Club's name and membership requirements.  Another meeting was held on April 1 in which the ASB denied the Club ASB status.  (Id., Ex. 21 (ASB meeting minutes)).  Following that meeting, Ms. Stewart claims that Assistant Principal Anderson informed her that the Club could amend the Charter application to address the ASB's concerns and resubmit its application.  (Stewart Decl., ¶ 10).  However, there are no written documents in the record supporting this assertion.

On April 3, Plaintiffs filed a law suit against the District, Principal Albrecht, Assistant Principal Anderson, and Barbara Grohe, Superintendent of the District.  Plaintiffs alleged violations of the Equal Access Act, the Free Speech Clause of the First Amendment, the Free Exercise Clause of the First Amendment, the Establishment Clause of the First Amendment, and the Equal Protection Clause of the Fourteenth Amendment.  They alleged jurisdiction under 42 U.S.C. § 1983.

On April 9, 2003, Assistant Principal Anderson wrote a letter to Ms. Stewart indicating that she could resubmit her ASB application.  The letter stated that "[a]s we discussed at the ASB meeting on March 28, by making minor changes to Article I [identifying the Club's name] and III [setting out

1    the membership criteria] of the proposed constitution for your club, you will address the points

2    raised." (Tierney Decl., Ex. 23).

3         On April 24, 2003, Ms. Stewart resubmitted an amended Charter application and amended

4    constitution. (Id., Exs. 11-12 ("the Third Application")). This version of the application differed from

5    the Second Application in several relevant respects. First, in addition to its previously listed intended

6    function, its purpose would be to "associate with other believers in Christian fellowship." Second, its

7    general members were to have "a true desire to study the Bible and grow in a relationship with Jesus

8    Christ." (Id., Ex. 11). The accompanying amended constitution stated that "the privilege of

9    membership is contingent upon the member complying in good faith with Christian character, Christian

10   speech, Christian behavior, and Christian conduct as generally described in the Bible." (Id., Ex. 12

11   ("the general membership policy")). Additionally, the application stated that "[o]nly those willing to

12   sign the statement of faith may be voting members." (Id., Ex. 11). The statement of faith requires the

13   signor to state that he or she believes "the Bible to be the inspired, the only infallible, authoritative

14   Word of God," and that "salvation is an undeserved gift from God." (Id., Ex. 12). The constitution

15   stated that "only persons who honestly sign the Statement of Faith ... are entitled to vote." (Id., Art.

16   III ("the voting membership policy")). Lastly, it required that any student holding office "must

17   honestly sign the statement of faith and believe in and be committed to biblical principles." (Id.)

18        In an ASB meeting on April 25, the ASB denied the Third Application. (Id., Ex. 22 (ASB

19   meeting minutes)). The ASB members were opposed to the Club's faith-based membership

20   requirement and the oath requirement for voting member status, and the Club's name "Truth" because

21   they felt that it implied that differing religious beliefs were lies. (Anderson Decl. accompanying Defs'

22   Resp. to Plfs' Mot. for Prelim. Inj., Exs. 1-3).

23        On May 12, 2003, Assistant Principal Anderson sent a letter to Ms. Undis and Ms. Stewart

24   stating that he was aware that their request for ASB status was "declined" by the ASB Council.

25   (Tierney Decl., Ex. 24). He informed Plaintiffs that, pursuant to District Policy 2340, they had "the

ORDER - 5

ability to discuss this matter" with the Principal.  If they were not satisfied with this discussion, they were "welcome to make an appointment with the District Superintendent."  Alternatively, they could contact that District Ombudservices' office.  Assistant Principal Anderson stated that the "administration here at Kentridge and in the District retains the final oversight role in decisions about ASB clubs."

In this round of briefing, Plaintiffs now assert that the Club as described in the Third Application actually has three categories of students who may attend.  The Court's Order denying Plaintiffs' Motion for Preliminary Injunction analyzed the Club as described in the Third Application as allowing two categories of students to participate: 1) general members, who must comply with the Christian conduct and speech standard; and 2) voting members, who had to sign the statement of faith.  Plaintiffs now attempt to recharacterize the Club as allowing three categories of students to attend: 1) attendees, which includes students of all religions whether or not they comply with the Christian conduct and speech standard; 2) general members, who must comply the Christian conduct and speech standard; and 3) voting members, who must sign the statement of faith.  (Second Stewart Decl., ¶¶ 5-7).

To support their general membership policy, Plaintiffs point to "codes of conduct" for membership that other ASB clubs at the School require.  The National Honor Society conditions membership on "scholarship, character, leadership, and service" and generally requires that members behave in a "courteous and respectful manner" and refrain from using illegal substances and alcohol.  (Second Tyler Decl., Ex. G).  The Girls Honor Society limits membership to girls with a certain GPA.  (Id., Ex. H).  The Boys Honor Society is intended to include "upright and virtuous students."  (Id., Ex. J).  The Gay-Straight Alliance is open to students who are "willing to work towards the goals of the club," which are listed as bringing "gay, lesbian, bisexual, transgendered, and questioning issue into the open, while working to decrease homophobia."  (Id., Ex. K).  The Key Club limits membership to those "interested in service, qualified scholastically, of good character, [and] possessing leadership

ORDER - 6

1    potential." (Id., Ex. M). Lastly, the ASB conditions membership on following "the sports code."

2    (Id., Ex. I). Participation in school sports requires that students comply with a code of conduct that

3    includes maintaining a certain GPA, attendance record, and not using drugs or alcohol. (Id., Ex. A

4    (Floyd Dep.) at 21). Additionally, the "sports code," as set out in the Athletic Handbook, requires

5    that students "conduct themselves in a manner that will inspire pride and approval." (Id., Ex. E).

6        Plaintiffs rely heavily on a passage from the deposition of the District Superintendent, Barbara

7    Grohe, for the proposition that the general code of conduct required of students relies on religious

8    principles, which is no different from the Club's religious code of conduct requirement for general

9    members. In her deposition, she was asked about her understanding of the meaning of "immoral

10   conduct." (Id., Ex. D (Grohe Dep.) at 68). Superintendent Grohe responded that "there are some

11   generally accepted parameters around sexual conduct or vulgar speech." She was then asked if "there

12   are general principles upon which your understanding of immoral conduct would come from, such as

13   the Golden Rule, the Ten Commandments, the Torah, the Bible, a philosopher?" She answered "yes,

14   all of those." (Id.) There is not enough of the deposition transcript included to know why she was

15   being asked this since Plaintiffs have not pointed to any club that explicitly refers to a prohibition on

16   "immoral conduct."

17       At oral argument on the preliminary injunction motion, Plaintiffs indicated that they seek to

18   have the School grant the Club ASB status based on its Third Application and accompanying

19   constitution. Nothing they have stated since indicates any change to their prior position. Indeed,

20   much of their summary judgment briefing addresses the general membership policy, which is unique to

21   the Third Application. Therefore, this Order is based on the Third Application.

22                                            ANALYSIS

23       Rule 56(c) provides, in part, that summary judgment is appropriate if "the pleadings,

24   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

25   show that there is no genuine issue as to any material fact and that the moving party is entitled to a

1   judgment as a matter of law." Fed. R. Civ. P. 56(c) (2003).  Summary judgment is not warranted if a

2   material issue of fact exists for trial.  Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir. 1995),

3   cert. denied, 516 U.S. 1171 (1996).  While "some alleged factual dispute between the parties will not

4   defeat" a motion for summary judgment, "disputes over facts that might affect the outcome of the suit

5   . . . will properly preclude the entry of summary judgment."  Anderson v. Liberty Lobby, Inc., 477

6   U.S. 242, 247-48 (1986).

7   I.  Municipal Liability Under § 1983

8          As a threshold matter, Defendants argue that they are not liable under 42 U.S.C. § 1983

9   because no District policy caused the alleged deprivation of Plaintiffs' constitutional rights.

10  Defendants raised this argument in an earlier Motion for Summary Judgment.  The Court denied the

11  motion on the grounds that there were genuine issues of fact as to 1) whether District officials of

12  policymaking authority had actual knowledge of and were deliberately indifferent to the alleged

13  constitutional violations occurring while Plaintiffs were seeking ASB status for the Club, and 2)

14  whether District officials attempted to insulate themselves from liability for their unconstitutional

15  policies by having the ASB Council deny the Club ASB status.  (Dkt. No. 46).  On both issues, the

16  Court noted that Plaintiffs should be allowed to conduct discovery to support their deliberate

17  indifference and/or evading liability theories of liability under § 1983.  Defendants now argue that

18  Plaintiffs have not revealed any facts that support either legal theory.

19         In general, municipalities and other bodies of local government are "persons" within the

20  meaning of 42 U.S.C. § 1983 that may be sued directly if they are alleged to have caused a

21  constitutional tort through "a policy statement, ordinance, regulation, or decision officially adopted

22  and promulgated by that body's officers."  Monell v. New York City Dept. of Social Services, 436

23  U.S. 658, 690 (1978).  While rejecting the use of the doctrine of respondeat superior, the Monell

24  Court nevertheless concluded that local government could be held liable when an injury was inflicted

25

1  by a government's "lawmakers or by those whose edicts or acts may fairly be said to represent official

2  policy . . . ." Id. at 694.

3        There are three alternative means by which Defendants could be held liable under § 1983.

4  First, a single decision by a policymaker can be considered "official policy" giving rise to municipal

5  liability. Pembaur v. Cincinnati, 475 U. S. 469, 483-85 (1986) (plurality opinion). Thus, acts or

6  decisions that were officially sanctioned or ordered by officials with final policymaking authority may

7  trigger municipal liability. Id. State law determines whether a particular official has final policymaking

8  authority. Id. In this case, the official with policymaking authority is the District Board of Directors

9  ("the Board"). Under Washington law, an associated student body is formed with the approval of,

10  regulated by, and operated subject to the control of the school district board of directors. RCW

11  28A.325.020, WAC § 392-138-010(1). See also RCW 28A.320.015(1) (a school district board of

12  directors has the discretionary power to set policies regarding school programs, activities, and

13  services). District Policies 1000 and 1001 identify the Board of Directors as the policymaker for the

14  District. (Tierney Decl., Exs. 1-2). The District's Board never decided one way or the other whether

15  the Club should be granted ASB status. Therefore, there is no § 1983 municipal liability under this

16  first standard.

17        As an alternative argument in support of this theory of liability, Plaintiffs argue the District is

18  liable under § 1983 because officials within the District were aware of the Ninth Circuit's opinion in

19  Prince v. Jacoby, 303 F.3d 1074, 1081 (9th Cir. 2002), cert. denied, 124 S. Ct. 62 (2003), and yet

20  treated the Club in the same manner that was found unlawful in Prince. In that case, the school had

21  denied a religious club ASB status and had instead granted it separate status as a club under a school

22  district policy (Policy 5525) that did not provide the same benefits as ASB clubs received. The Ninth

23  Circuit held that the Equal Access Act required that schools provide religious clubs with equal access,

24  which meant allowing them to exist under the same terms and conditions as other clubs. Id. at 1081-

25  83. According to Plaintiffs, Defendants have done the exact same thing as in Prince when they

1   indicated that the School would allow the Club in its current proposed form to be a Policy 2153 club,

2   which is similar to a Policy 5525 club that was at issue in <u>Prince</u>.  Plaintiffs contend that the District

3   had a duty to ensure that the Club here was given the same access to ASB status as other clubs and

4   that by failing to do so, they are liable under § 1983.

5          Plaintiffs' argument is unpersuasive.  The District may very well have been aware of <u>Prince</u> and

6   its requirement that schools grant access to religious clubs on the same terms and conditions as other

7   clubs.  (See McCaleb Aff., Ex. A at 17-18).  The District complies with this requirement, as evidenced

8   by the fact that there are two religious clubs within the District that have ASB status.  (Tierney Decl.,

9   Ex. 18 ("Bible Club" at Meridian Junior High School) and Ex. 19 ("Truth Seekers" at Kentwood High

10  School)).  The Club in this case is different from those clubs and the club at issue in <u>Prince</u> because

11  none of those clubs had the exclusive membership policies that are present in this case.  <u>Prince</u>'s

12  holding did not address the legal issues presented by these membership policies.  Therefore, the

13  District's knowledge of <u>Prince</u> does not compel the District to grant the Club ASB status and does not

14  mean that allowing them to exist as a Policy 2153 club is unlawful under <u>Prince</u>.    A second means by

15  which Defendants could be held liable under § 1983 is if Plaintiffs demonstrate that a decision by an

16  official with policymaking authority reflected deliberate indifference to the risk that a violation of

17  Plaintiffs' constitutional rights would follow the decision.  <u>Bd. of County Commissioners of Bryan Co.</u>

18  <u>v. Brown</u>, 520 U.S. 397, 411 (1997).  To prove deliberate indifference, a plaintiff has to show that an

19  official with policymaking authority had actual knowledge of the alleged constitutional violations.  <u>Cf.</u>

20  <u>Gebser v. Lago Vista Independent Sch. Dist.</u>, 524 U.S. 274, 290-291 (1998) (requiring official's

21  actual knowledge of sexual harassment for school's liability in Title IX claim in parallel to deliberate

22  indifference standard for § 1983 claims).  As stated above, the Board is the official with policymaking

23  authority in this instance.  Therefore, to establish municipal liability under this theory, Plaintiffs must

24  show that the Board had actual knowledge of the alleged constitutional violations that resulted from

25  not granting the Club ASB status.

1    Plaintiffs have not introduced any evidence indicating that the Board knew of the Club and its

2    attempt to attain ASB status between September, 2001 when the First Application was submitted,

3    though December, 2002.  While the Assistant Principal, Principal, and possibly the School's in-house

4    counsel knew of the application and appeared to sit on it for over one year, there is no evidence that

5    the Board knew of the Club and its pending application during this time.

6    In January, 2003, Plaintiffs' lawyer sent two letters, one to the Principal and the second to the

7    School's in-house counsel, regarding Plaintiffs' grievances and the legal authority that he contended

8    compelled the School to grant the Club ASB status.  Again, however, there is no direct evidence that

9    either the Principal or the School's in-house counsel informed the Board about these letters or

10   forwarded a copy of either to them.

11   Plaintiffs argue that the Board knew of the Club's pending application and the potential

12   constitutional issues involved before this lawsuit was filed on April 3, 2003.  However, the evidence to

13   support this proposition is inconclusive.  Plaintiffs cite only two statements by two Board members

14   from the various depositions of Board members that Plaintiffs took.  One Board member states that

15   the Board discussed the Club sometime during 2003; but he cannot remember when.  (McCaleb Aff.,

16   Ex. C).  Thus, it is inconclusive if this discussion took place before or after Plaintiffs filed this lawsuit

17   in April, 2003.  The other deponent, the Board president, states that the Board discussed the Club

18   sometime "within the past year."  (Id., Ex. D).  He was deposed in February, 2004.  Thus, his

19   recollection is that the Board discussed the Club sometime between February, 2003 and February,

20   2004.  Again, this statement is inconclusive as to whether this discussion occurred before or after

21   Plaintiffs filed this lawsuit.  Given this inconclusive evidence, Plaintiffs have not provided sufficient

22   evidence to support their deliberate indifference theory of liability.

23   A third alternative theory of municipal liability provides that a local government may be liable

24   in § 1983 actions when the local government egregiously attempts to insulate itself from liability for its

25   unconstitutional policies.  City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988) (plurality

1    opinion).  Thus, in certain circumstances, liability may attach when a policymaker delegates his

2    authority to another official.  The Supreme Court in <u>Praprotnik</u> pointed to two instances in which

3    delegation of authority would trigger § 1983 municipal liability: first, if a particular decision by a

4    subordinate "was cast in the form of a policy statement and expressly approved by the supervising

5    policymaker," and second, if "a series of decisions by a subordinate official manifested a 'custom or

6    usage' of which the supervisor must have been aware."  <u>Id.</u> at 130.  In such instances, "the supervisor

7    could realistically be deemed to have adopted a policy that happened to have been formulated or

8    initiated by a lower-ranking official."  <u>Id.</u>  However, the mere exercise of discretion by a lower level

9    official or "[s]imply going along" with the lower-ranking official's decisions is not sufficient to trigger

10   § 1983 liability.  <u>Id.</u> at 126-27, 130.

11            Plaintiffs argue that the Defendants attempted to evade liability by channeling the decision to

12   grant the Club ASB status to the ASB Council, even though the Defendants knew that this decision

13   had constitutional implications and that the ASB Council could not properly address such issues.

14   According to Plaintiffs, the Defendants used the ASB Council as the District's proxy to deny the

15   application and thereby attempted to evade liability.

16            In contrast, Defendants argue that they allowed the ASB Council to make a recommendation

17   to the Principal, which is part of the normal procedure in granting a club ASB status.  (Tierney Decl.,

18   Ex. 11).  When the ASB Council recommended denying their Second Application, Plaintiffs filed a

19   lawsuit three days later, but at the same time submitted their revised Third Application a few weeks

20   later.  When the ASB Council recommended denying that application, Assistant Principal Anderson

21   informed Plaintiffs in the May 12, 2004 letter that they could pursue additional avenues within the

22   School administration to achieve their desired ASB status.  Defendants maintain that, because

23   Plaintiffs chose not to pursue these options, they never received a decision by anyone with final

24   policymaking authority.  Consequently, there is no official policy act on which to base § 1983

25   municipal liability.

ORDER - 12

1        Arguably, the Board has delegated its ASB club approval responsibilities to School

2   administrators.  One Board member stated that he has never approved ASB clubs in his nine years on

3   the Board.  (Second Tyler Decl., Ex. C).  Thus, there is arguably a practice of delegating this

4   responsibility to administrators within the School.  Assistant Principal Anderson's May 12, 2004 letter

5   bolsters this conclusion.  It does not state that Plaintiffs would have to take their appeal directly to the

6   Board.  Rather, it states that Plaintiffs could discuss the matter with the Principal, the Superintendent

7   and/or the District Ombudservices' office.  It also stated that the "administration here at Kentridge and

8   in the District retains the final oversight role in decisions about ASB clubs."  These statements imply

9   that School officials have the final authority to decide ASB-related issues.

10       Even if this is the case, however, Plaintiffs never sought a final decision from any of these

11  officials.  To overcome this problem, Plaintiffs point to Assistant Principal Anderson's deposition, in

12  which he stated that he told the ASB Council that if they voted to recommend granting the Club ASB

13  status, then the School's lawyers would determine if the Club would be allowed; but if they voted to

14  recommend denying the Club ASB status, "it would end it."  (Second Tyler Decl., Ex. C).  However,

15  even if Assistant Principal Anderson did convey to the ASB Council that a denial by them would "end

16  it," Assistant Principal Anderson is not the final decision-making authority as to this issue.  He states

17  in his deposition that he came up with this formulation on his own; no one advised him of it.  (Id.)

18  Therefore, the ASB Council's recommendation that the Club's application be denied cannot be said to

19  constitute an official action by the District and does not trigger § 1983 municipal liability.

20       While School officials repeatedly referred the matter to the ASB Council and were generally

21  tardy in responding to Plaintiffs' repeated requests, which might suggest that they were channeling the

22  decision-making to the ASB and thereby attempting to insulate the District from liability, Plaintiffs

23  continually changed the nature of the club they wanted approved, even after they filed this lawsuit.

24  The shifting nature of Plaintiffs' proposals warranted repeatedly returning to the beginning of the

25  process, namely the ASB Council's recommendation.

ORDER - 13

1    In sum, the District cannot be held liable under § 1983 for any alleged constitutional violations

2    because none of the acts denying the Club ASB status can be attributed to the policymaking authority

3    in the District overseeing the ASB.  Because § 1983 "provides remedies for deprivations of rights

4    established elsewhere," City of Oklahoma City v. Tuttle, 471 U.S. 808, 816 (1985), Plaintiffs'

5    constitutional claims are rightly dismissed on this basis.[4]  Tuttle noted that even if a plaintiff has been

6    deprived of a constitutional right, the plaintiff must still establish that the deprivation was caused by a

7    governmental body that is liable under the requirements established in Monell.  Id. at 817.

8    Lastly, Plaintiffs maintain that even if the District is not liable under § 1983, the individual

9    Defendants Superintendent Grohe, Principal Albrecht, and Assistant Principal Anderson are liable for

10   their unlawful acts.  (Plfs' Resp. at 1 n.2).  However, Plaintiffs' Complaint states that each of these

11   three Defendants are sued in their official capacities.  (Plfs' Compl., ¶¶ 4.8, 4.13, 4.17).  After the

12   Supreme Court in Monell made clear that units within local governments can be liable under § 1983,

13   the Court noted that "official-capacity suits generally represent only another way of pleading an action

14   against an entity of which an officer is an agent."  Monell, 436 U.S. at 690-91 & n.55.  Thus, "an

15   official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."

16   Kentucky v. Graham, 473 U.S. 159, 166 (1985).  Therefore, Plaintiffs' argument on this issue is

17   without merit.

18   II.  The Equal Access Act

19   The Court's Order Denying Plaintiffs' Motion for a Preliminary Injunction analyzed the

20   Plaintiffs' Equal Access Act claim and concluded that denying the Club ASB status based in part on its

21   general membership policy did not violate this statute.  The parties have not presented any facts that

22   would change this analysis and conclusion.  Likewise, Plaintiffs have not presented any legal

23   arguments that persuade this Court that its previous analysis and conclusion were erroneous.

24

25   [4]  Both parties noted at oral argument that Plaintiffs' Equal Access Act claim is not dependent
on § 1983 liability and therefore must be addressed on its merits.

1    The Equal Access Act ("the EAA" or "the Act") guarantees public school students the right to

2    form noncurriculum groups to engage in religious, political, or philosophical discourse.  The Act

3    states:

> It shall be unlawful for any public secondary school which receives Federal
> financial assistance and which has a limited open forum to deny equal access or a
> fair opportunity to, or discriminate against, any students who wish to conduct a
> meeting within the limited open forum on the basis of religious, political,
> philosophical, or other content of the speech at such meetings.

7    20 U.S.C. § 4071(a).

8    Thus, the Act applies only when the school receives federal funding and has created a limited

9    open forum.  A limited open forum is defined as allowing one or more noncurriculum-related student

10   groups to meet on school premises during non-instructional time.  § 4071(b).  Neither party disputes

11   that Kentridge High School receives federal funding and that it has created a limited public forum by

12   granting numerous noncurricular student clubs ASB club status and benefits.  (Stewart Decl., Ex. A

13   (listing ASB clubs)).  Therefore, the Act applies to Kentridge High School.

14   The Act prohibits Kentridge High School from denying equal access to or discriminating

15   against students who wish to meet as a noncurricular student club on the basis of the content of the

16   speech as such meetings.  The Club was denied ASB status due, in part, to its exclusionary general

17   membership policy.[5]  Plaintiffs have not shown that the Club's exclusionary general membership policy

18   is protected speech under the EAA.  Therefore, denying the Club ASB status because of its

19   exclusionary general membership policy does not constitute a denial of equal access or discrimination

20   based on the content of the Club's speech.  As such, the School has not violated the EAA.

---

23   [5] The Club was also denied ASB status due to the Club's exclusionary voting membership
     policy and objections to the Club's name "Truth."  Because the Court bases this Order on the Club's
24   exclusionary general membership policy, the Court need not reach the validity of either of these
     aspects of the Club or the denial of ASB status based on them under the EAA or constitutional
25   principles.

ORDER - 15

1    The Second Circuit addressed this issue in a case with similar facts.  Hsu v. Roslyn Union Free

2    Sch. Dist., 85 F.3d 839 (2d Cir. 1996).  In Hsu, students applied to their public high school to form a

3    noncurricular religious club.  General membership was to be open to all students.[6]  Id. at 849.

4    However, the club had proposed a requirement that all officers be "professed Christians though

5    baptism or confirmation."  Id.  The school rejected the club on the grounds that the club's

6    exclusionary officer policy violated the school's nondiscrimination policy.  Id. at 850.

7    The school argued that it had not violated the EAA because it did not deny the club official

8    recognition on the basis of the content of the club's religious speech, but rather on the basis of its

9    exclusionary officer policy.  The Second Circuit rejected that argument.  The court held that the club's

10   exclusionary officer policy as applied to the limited number of officers who led the group in prayer and

11   spiritual songs was protected "speech" under the EAA.  It based this conclusion on Hurley v. Irish-

12   American Gay, Lesbian and Bisexual Group of Boston, in which the Supreme Court held that the

13   organizers of an Irish parade in Boston could exclude a gay, lesbian, and bisexual group from

14   marching in the parade with a banner expressing their pride in their Irish heritage as openly gay,

15   lesbian, and bisexual people.  515 U.S. 557 (1995).  Hurley observed that the message a group imparts

16   can depend on the group's ability to exclude those who might broadcast a contradictory message.

17   Therefore, the ability to exclude such people is protected under the First Amendment's freedom of

18   expressive association.  Id. at 574.  In Hsu, the religious club's constitution indicated that certain

19   officers would be required to lead and perform the club's religious speech in prayer and song.

20   Therefore, the club's exclusionary officer policy was statutorily protected "speech" because the policy

21   was a way to assure that only a certain type of religious speech would occur at the meetings.  The

22

_____

23       [6]  The club's original application indirectly required that all members be Christians by stating
that the club's purpose was to provide time "when Christians gather to praise God."  85 F.3d at 849.
24   The school denied official recognition because of this requirement, among other reasons.  In response,
the students who initiated the club changed the reference from "Christians" to the more inclusive
25   "people."  Id. at 849-50.

1    court held that it was acceptable to require that such officers be "professed" Christians only to the

2    extent that there was an "integral connection between the exclusionary leadership policy and the

3    religious speech at their meetings."  Hsu, 85 F.3d at 857.  By concluding that the exclusionary officer

4    policy applied to these limited officer positions was statutorily protected "speech," the school's denial

5    of official recognition was based on the content of the speech.  As such, the school had violated the

6    EAA.

7          Using the same analysis, the court found that there was no similar reason to justify the club's

8    requirement that officers whose duties did not involve leading the club in prayer or song be

9    "professed" Christians.  Notably, the court concluded that such a requirement would be akin to

10   imposing a religious test for membership or attendance, which the court concluded would be "plainly

11   insupportable."  Id. at 857-58.  "It is difficult to understand how allowing non-Christians to attend the

12   meetings and sing (or listen to) Christian prayers would change the [c]lub's speech."  Id. at 858 n.17.

13   Therefore, the club's exclusionary officer policy for those positions was not statutorily protected

14   speech.  As such, the school did not violate the EAA by conditioning approval of the club on

15   eliminating the exclusionary policy for those secondary officer positions.  This conclusion is consistent

16   with Hurley.  Hsu correctly read Hurley as allowing the exclusion of people who intended to broadcast

17   a particular message that was contrary to the group's message.  Id. at 856.  Hurley did not address

18   whether the parade organizers could exclude all gay, lesbian, and bisexual people as individual

19   participants in the parade.  Hurley, 515 U.S. at 572.

20         Here, the Club's general membership policy goes far beyond the officer policy upheld in a

21   limited fashion in Hsu.  There is no indication that the Club's general members will control the Club's

22   speech; they have no direct control over the prayer and study that will occur at Club meetings, the

23   election of the Club's officers who are responsible for prayer and study at the meetings, or the Club's

24   constitution.  Instead, the exclusionary general membership policy is the type of religious test for

25

ORDER - 17

1   membership[7] that <u>Hsu</u> indicated would be "plainly insupportable."   As such, the exclusionary general

2   membership policy is not statutorily protected speech.  Denying the Club ASB status based in part on

3   this policy does not violate the EAA.  Plaintiffs argue that it is nonetheless violates the First

4   Amendment right of expressive association.

5   <u>III.  First Amendment Right of Expressive Association</u>

6           Even if the Court's conclusion that Defendants cannot be held liable under § 1983 for alleged

7   constitutional violations were deemed erroneous, Defendants have not violated Plaintiffs' First

8   Amendment right of expressive association.  While the Club has a First Amendment right to expressive

9   association, which includes the right to exclude general members based on religion, the School can

10  justifiably limit that right in order to further a legitimate and compelling interest in not allowing an

11  ASB club to discriminate on the basis of religion.  The Court's Order Denying Plaintiffs' Motion for a

12  Preliminary Injunction analyzed the Plaintiffs' First Amendment right to expressive association and

13  reached this conclusion.  Plaintiffs have presented additional arguments on this issue in their Motion

14  for Summary Judgment.  Despite those arguments, however, the Court reaches the same conclusion

15  that it reached previously.

16          Implicit in protected First Amendment activities is a corresponding right to associate with

17  others in pursuit of religious and other ends.  <u>Roberts v. United States Jaycees</u>, 468 U.S. 609, 622

18  (1984).  Forcing a group to accept members it does not wish to accept may impair the group's ability

19  to express its unique views and to refrain from expressing views with which it disagrees.

20  Consequently, the freedom of association encompasses a freedom not to associate.  <u>Id.</u> at 623.  In the

21  context of student clubs on college campuses, denying them official recognition without justification

22  burdens the student club's associational rights.  <u>Healy v. James</u>, 408 U.S. 169, 181 (1972).

23          _____

24          [7]  Plaintiffs argue that the general membership policy is not a "religious belief" requirement, but
    rather a code of conduct based on religious beliefs as determined by the Club's voting members and

25  leadership.  As discussed more thoroughly below, the Court concludes that this is a distinction without
    a meaningful difference.

1        Plaintiffs rely on <u>Democratic Party v. Wisconsin</u>, 450 U.S. 107 (1981), <u>New York State Club</u>

2   <u>Ass'n v. City of New York</u>, 487 U.S. 1 (1988), and <u>Jaycees</u> to support their argument that they have a

3   right of association which allows them to exclude students from voting membership and general

4   membership on the basis of religion.  In <u>Democratic Party</u>, Wisconsin had an open primary, allowing

5   anyone to vote for a Democratic nominee.  The National Democratic Party challenged the law because

6   it violated the Democratic Party's rules limiting voting in primaries to voters who publically declared

7   affiliation with the Party.  The Court acknowledged that the state had a legitimate compelling state

8   interest in encouraging voter participation.  450 U.S. at 121.  However, it held that the state could not

9   then compel the Party to seat the delegation elected in a manner contrary to the Party's exclusionary

10   voting rule.  The freedom to associate to advance political beliefs includes the right to limit

11   membership in the association.  The forced inclusion of people not affiliated with the political party

12   "may seriously distort [the party's] collective decisions – thus impairing the party's essential functions

13   – and . . . political parties may accordingly protect themselves from intrusion by those with adverse

14   political principles."  <u>Id.</u> at 122.

15        In <u>New York State Club Ass'n</u>, plaintiffs brought a facial challenge to a state law prohibiting

16   discrimination in public accommodations.  The state law prevented an association from using race, sex,

17   or creed (among others) to exclude membership, but did not prevent groups from employing

18   "legitimate criteria for determining membership."  487 U.S. at 13.  The Court found the law passed

19   constitutional muster.  At the same time, the Court contemplated that an association might be able to

20   show that "it is organized for specific expressive purposes and that it will not be able to advocate its

21   desired viewpoints nearly as effectively if it cannot confine its membership to those who share the

22   same sex, for example, or the same religion."  <u>Id.</u>  In light of these holdings, it appears that the Club

23   may have a First Amendment right in expressive association to exclude general members based on

24   religion.

25        A.  Limits on the Right to Expressive Association

1    Nonetheless, it is well established that the right of association is not absolute.  A compelling

2    state interest unrelated to the suppression of ideas can justify limiting the right of association as long

3    as the interest cannot be served through less restrictive means.  Jaycees, 468 U.S. at 623.  The Jaycees

4    were an educational and charitable nonprofit that promoted the interests of young men.  A state law

5    required that the Jaycees accept women as voting members.  While the Court recognized that the law

6    intruded into the internal structure of the association by forcing it to accept members it did not desire

7    to accept, the Court concluded that the intrusion was justified by the state's compelling interest in

8    eradicating discrimination against women.  Id.

9    In this case, there is a legitimate and compelling state interest in having public schools provide

10   equal opportunity and treatment to all students to participate in school activities programs without

11   regard to religion, race, or sex (among other things).  The School District's nondiscrimination Policy

12   3210 is designed to further this compelling state interest.[8]  It states "[t]he district will provide equal

13   educational opportunity and treatment for all students in all aspects of the academic and activities

14   program.  Equal opportunity and treatment is provided without regard to race, creed, color, national

15   origin, [or] sex . . . ."  (Tierney Decl., Ex. 7).  Providing equal opportunity and treatment includes

16   providing all students with equal access to student clubs allowed to operate on campus.  Therefore,

17   Policy 3210 prohibits denying individual students access to student activities programs such as student

18   clubs on the basis of religion.  It is particularly important in the public school context to prevent race,

19   religion, or sex-based exclusion or discrimination in the provision of school benefits and programs.

20   Preventing discrimination against these uniquely protected classes addresses past discrimination that

21   our country has struggled to overcome.  A public school must not only prevent such discrimination,

22

23   _____

24       [8] As Defendants' point out, this interest is derived from the broader state-wide interest in
     preventing discrimination in public accommodation based on religion, race, sex, national origin, or
25   disability, as manifested in RCW 49.60 et seq.

ORDER - 20

1  but has an affirmative obligation to provide access to all of the school's activities for all students

2  regardless of their religion.

3       Plaintiffs present two arguments to support their contention that the Club does not exclude

4  students from participation in the Club on the basis of religion.  Neither are persuasive.  First, under

5  the Club's three-tier membership system, students of all or no religious beliefs may attend as

6  "attendees."  (Plfs' Mot. at 10-11).  This relies on Plaintiffs' new assertion that there are three

7  categories of students who may participate in the Club's activities.  However, this assertion is not set

8  forth anywhere in their Third Application materials.  Their Third Application materials refer to only

9  two categories of students as participants – general members and voting members.  In Plaintiffs'

10  pleadings and at oral argument, Plaintiffs pointed to language in their First and Second Applications to

11  support their assertion that the Club has this three-tiered membership system.  However, Plaintiffs

12  cannot have it both ways; they cannot demand ASB status for the Club as proposed in their Third

13  Application, which is materially different from their two previous applications, and at the same time

14  rely on language in those two previous applications to support their demand.

15       Second, Plaintiffs argue that the general membership policy refers to a code of conduct, not

16  religious beliefs.  Plaintiffs made this general argument in their Motion for Reconsideration of the

17  Preliminary Injunction Order.  The Court rejected it, stating that a student interested in joining the

18  Club as a general member would have to determine what constitutes Christian character, speech, and

19  conduct, which necessarily requires delving into religious beliefs.  Plaintiffs now claim that the Club's

20  voting members and leadership would determine what this Christian code of conduct is, based on their

21  religious beliefs.  According to Plaintiffs, students of any religion may become general members as

22  long as their conduct conforms to the code of conduct as established by the Club's voting members

23  and leadership.  (Plfs' Mot. 11-12).  However, while the voting members and leadership may

24  determine what they believe constitutes Christian conduct and speech, other students wishing to join

25  as general members may have different beliefs regarding Christian conduct and speech, conduct

ORDER - 21

1   themselves accordingly, and maintain that they have complied with the Club's code of conduct. The

2   distinction between the two codes of conduct necessarily requires delving into religious beliefs.

3   Exclusion is based those who hold different religious beliefs. This points to the fatal flaw in Plaintiffs'

4   argument that the Club is no different from the numerous other ASB clubs that condition membership

5   on certain codes of conduct. None of those clubs' codes of conduct are explicitly based on religion

6   (let alone one group's interpretation of one religion). Some clubs require that students have good

7   character or act virtuously. Good character, virtuous behavior, or moral conduct does not demand or

8   require interpretation of religious principles.[9] What is "Christian" conduct varies widely from sect to

9   sect, from church to church, or even from individual to individual, and necessarily embroils one in

10  discussions of religious dogma.

11      Despite Plaintiffs' arguments to the contrary, granting the Club ASB status with its

12  exclusionary general membership policy would violate the School's non-discrimination policy because

13  it would deny individual students the opportunity to participate in the Club based on their religion.

14  Therefore, the School's compelling interest in preventing discrimination based on religion justifies

15  intruding upon the Club's right to expressive association. As required by the Jaycees, the School's

16  denial of ASB status is not aimed at the suppression of the Club's speech or ideas; it is aimed at

17  preventing violation of the School's nondiscrimination policy.[10] Additionally, Policy 3210 is

18  sufficiently narrowly tailored. For example, it would not justify the School's denial of a politically-

19  oriented student club that restricted general membership based on political ideology. In that instance,

20  the club's right to expressive association would not discriminate based on race, religion, sex, or

21  national origin. As such, the club's exercise of its expressive association would not undermine the

22

23      [9] The fact that the District Superintendent stated that, in her view, "immoral conduct" is based
    in part on principles outlined in various religious texts is not relevant to this analysis.

24

25      [10] It is worth noting that there are two religious clubs that have ASB status at other schools in
    the District. Neither of these clubs exclude members based on religious belief or conduct.

1   School's legitimate interest in enforcing its non-discrimination policy.  Consequently, the School could

2   not rely on Policy 3210 to limit the club's right to expressive association.

3        This conclusion is consistent with the Supreme Court's decision in <u>Boy Scouts of America v.</u>

4   <u>Dale</u>, 530 U.S. 640 (2000).  <u>Boy Scouts</u> limited <u>Jaycees</u> by holding that a state could enforce its public

5   accommodations statute at the expense of a group's right of association only when doing so would not

6   materially interfere with the ideas that the organization seeks to express.  <u>Id.</u> at 657-58.  The Jaycees'

7   message was unrelated to gender.  Therefore, forcing the Jaycees to accept women did not materially

8   interfere with the Jaycees' message.  In contrast, the Court held that the Boy Scouts could exclude a

9   homosexual as a scoutmaster because the presence of an openly gay scoutmaster would undermine or

10  distort the Boy Scout's moral and religious "message" that it intended to inculcate in its members.  <u>Id.</u>

11  at 653.  Therefore, the state could not force the Boy Scouts to accept gay scoutmasters under the

12  state's public accommodations law.  <u>Id.</u> at 658.  The Court noted that this result was consistent with

13  <u>Hurley</u>.  Even still, the Court noted that expressive association could not be used as a shield against

14  antidiscrimination laws by simply asserting that acceptance of a certain type of member would impair

15  the group's message.  <u>Id.</u>

16       Here, there is no indication that inclusion of students of differing religious faiths and differing

17  versions of the Christian faith as general members will materially interfere with the Club's expression

18  of its ideas.  The general members do not control the Club's Bible study and prayer functions.  They

19  do not lead the Club in its spiritual activities, nor do they dictate or control the other members'

20  religious beliefs.  If the Club were forced to open general membership to all students, the Club could

21  still expound upon its particular religious beliefs, including for example the idea that only certain

22  beliefs, conduct, and speech are truly Christian.

23       Plaintiffs' argument to the contrary is not persuasive.  Plaintiffs argue that excluding students

24  who do not comply with the general membership religious requirement is necessary for the Club's

25  purpose and effectiveness.  (Plfs' Mot. at 8-10).  Plaintiffs cite a particular passage in <u>Jaycees</u>, in

which the Supreme Court observed that forcing the Jaycees to include women would not impede the group's ability to promote the interests of men and would not impose any restriction on the group's ability to exclude people of different ideologies or philosophies. (Plfs' Mot. at 9). Plaintiffs maintain that they are a private organization that has a right to limit its membership based on religious ideology because that religious ideology is integral to the Club's purpose.[11] First, even if the Club, viewed in isolation, is a private organization, the very ASB status it seeks is part of the provision of benefits that the public school provides to students. Washington law requires schools to control the operation of, and oversee, ASBs and their activities. See RCW 28A.325.020, WAC 392-138-013(1). Thus, the Club is not a purely private organization.

Moreover, Hsu recognized that the school context requires a unique balancing of interests. Hsu held that a religious club could exclude students from core leadership positions on the basis of religion because those leadership positions were important to the club's expression of its religious ideas. But it also held that the club could not exclude students from non-core leadership positions. Here, the Club's general membership exclusion is even more restrictive and has no integral connection to the Club's expression of its religious ideas. As such, the School can rightfully prioritize the School's legitimate interest in providing all students access to all student clubs without regard to the students' religious beliefs over the Club's interest in excluding such students as general members.

Boy Scouts and Hurley are further distinguishable from this case on a number of grounds. First, they are limited by the fact that homosexuals are not a protected class under current law. Unlike in the Jaycees, there is no corresponding compelling state interest in preventing discrimination against gay and lesbian citizens. In this case, however, there is a compelling state interest in providing equal treatment to students of all religious faiths, as discussed above. Additionally, both Hurley and Boy

---

[11] The Court notes that Plaintiffs' argument that they have a right to exclude general members based on ideology or beliefs contradicts their earlier argument that their general membership policy does not exclude on the basis of belief but only on the basis of conduct.

Scouts confronted a situation where the forced inclusion did not apply to general participants or members but rather of those who would broadcast a message contrary to the group's intended message.  In Hurley, the contrary message would have been broadcast outwardly to the public in the Boston parade by banners displayed during the parade.  In Boy Scouts, the contrary message would have been broadcast inwardly to the rest of the Boy Scout members by a scoutmaster acting in a leadership position.  Neither are like the situation here. General members of the Club are merely participants, not leaders.  Lastly, neither Boy Scouts nor Hurley occurred in the public school context.

Finally, Plaintiffs argue that the only way the School may justifiably prohibit the Club from excluding voting members based on religion is if such exclusion constitutes invidious discrimination. Plaintiffs cite Hsu as standing for the general rule that

> When a sectarian club discriminates on the basis of religion for the purpose of assuring the sectarian religious character of its meetings, a school must allow it to do so unless that club's specific form of discrimination would be invidious (and would thereby violate the equal protection rights of other students), or would otherwise disrupt or impair the school's educational mission.

Hsu, 85 F.3d at 872-73.  Plaintiffs seem to ignore the part of Hsu that held that the school could justifiably prohibit the religious club from requiring that officers who had no control over the club's message or speech be professed Christians.  The court noted that this would be akin to a general membership requirement, which it deemed "plainly insupportable."  The court reached this conclusion without going through any invidious discrimination analysis.

Because the Court concludes that Defendants may justifiably limit Plaintiffs' right to expressive association by withholding ASB status to the Club based on its religious-based exclusionary general membership policy, the Court need not reach the parties' arguments under Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503 (1969), regarding whether granting the Club ASB status would cause material disruption to the School's educational mission.  Likewise, because Plaintiffs' cursory Equal Protection Clause, Establishment Clause, and Free Exercise Clause arguments are all subsumed

ORDER - 25

within their First Amendment argument, the Court's need not explicitly address these arguments.
Lastly, in light of the Court's holding, the Court need not reach Defendants' Establishment Clause
argument.

CONCLUSION

The Court GRANTS Defendants' Motion for Summary Judgment and DENIES Plaintiffs'
Motion for Summary Judgment.  Defendants are not liable under § 1983 for any alleged constitutional
violations.  Even if they were, Defendants' actions have not violated Plaintiffs' constitutional rights.
Likewise, Defendants' actions have not violated the Equal Access Act.

The clerk is directed to provide copies of this order to all counsel of record.

Dated: September 23, 2004

/s/ Marsha J. Pechman
Marsha J. Pechman
United States District Judge

ORDER - 26